**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DEANNA CARECCIO, ARVIND CHANDRAN, BRENDA CHAQUETTE, CHAD J. COOK, JEFFREY COSTA, LISA COSTANZA, WILLIAM HOYER, KEVIN MORRIS, and EDWARD MOTA, *Individually and on behalf of others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>BMW of NORTH AMERICA LLC, BRIDGESTONE CORPORATION, BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC,<br><br>Defendants. | Civ. Action No. 08-2619<br><br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

The parties have reached a settlement of the issues raised in this lawsuit alleging breach of warranty on behalf of all current and former owners and lessees of model year 2006 and 2007 BMW 3 series vehicles equipped with Bridgestone Turanza EL42 run-flat tires. This Court issued an Order granting preliminary approval that provided for notice of the settlement terms to approximately 190,000 potential class members. [D.E. 107.] Fourteen class members filed written objections to the settlement terms and 27 class members chose to opt out.

The Court has held a hearing for purposes of granting final approval of the settlement, at which time it questioned counsel about the tiered relief provided to the affected car owners, the viewpoints of the objectors, the attorney fee request, and related issues.

## I.  The Litigation

In May 2007, Kevin Morris and Glenn Semow filed a class action in the Northern District of California, *Morris v. BMW of North America, LLC*, against BMW of North America, LLC ("BMW"), Bridgestone Americas Tire Operations, LLC ("BATO"), and Bridgestone Corporation ("Bridgestone") on behalf of consumers who purchased or leased 2006 and 2007 BMW 3 series cars originally equipped with Turanza EL42 run-flat tires (the "Tires").  The lawsuit alleged that defendants should have known that the Tires were defective and prone to irregular wear and excessive noise, which required BMW drivers to replace the Tires or experience a noisy and rough ride.  On August 31, 2007, plaintiffs in the California action amended the complaint.  BMW filed a motion to dismiss, which, after oral argument, was granted in part and denied in part.  Discovery went forward, including document production and depositions.  The plaintiffs made a motion for class certification, which was fully briefed. Before the Northern District of California entertained the motion, and after a mediation session, the parties agreed to dismiss the California action voluntarily with the understanding that the matters at issue would be re-filed in this District.

This action was filed on May 28, 2008, with named plaintiffs Arvind Chandran, Brenda Chaquette, Chad J. Cook, Jeffrey Costa, Lisa Costanza, William Hoyer, Kevin Morris, and Edward Mota filing against the same defendants.  [D.E. 1.]  On September 29, 2008, plaintiffs filed a consolidated amended complaint to add two additional plaintiffs, Deanna Careccio and Patricia Kurth.  [D.E. 24.]

When this lawsuit was filed, BMW had already instituted a response to complaints from customers about the Tires, specifically a Service Information Bulletin ("SIB") to its dealers, allowing for reimbursement of certain parts or labor costs if the Tires were replaced before 20,000 miles. Central to plaintiffs' theory in the complaint was that the SIB was both an inadequate response to the problems encountered by owners and lessees, and an improper "secret warranty." At the final approval hearing, counsel for plaintiffs was explicit that the clandestine nature of the SIB and its ineffectiveness were at the heart of the lawsuit.

In this action, plaintiffs sued for breach of express warranty, breach of the covenant of good faith and fair dealing, breach of implied warranty, violations of the Magnuson-Moss Warranty Act and, on behalf of the applicable sub-classes of plaintiffs, violations of the consumer protection statutes of New Jersey, Texas, Connecticut and California.

BMW and BATO, and subsequently Bridgestone, moved to dismiss. The parties fully briefed their respective positions, but agreed to stay motion practice in favor of mediation before John J. Hughes, U.S.M.J. (ret.). Mediation was successful, and the settlement under consideration was the result.

## II. The Settlement and Plan of Allocation

Pursuant to the terms of the settlement agreement, as set forth in Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement, and Award of Attorneys' Fees, Expenses and Incentive Awards, the parties have agreed to the following:

1.    Reimbursement For Past Turanza Tire Replacements Prior To 10,000 Tire Miles

Every Class Member who replaced the Tires at a BMW Center due to irregular wear prior to 10,000 Tire miles[1] will be eligible for reimbursement (in

---

[1] At oral argument, counsel for plaintiffs was careful to distinguish between "car miles," which indicate the number of miles a car has traveled, and "Tire miles," which represents the number of miles which a set of Tires traveled. Of course, a set of Tires could have been placed on one of the class vehicles after it had been on the road for thousands

the form of a check) on the replacement tires covering one-hundred percent (100%) of the cost of the tires and one-hundred percent (100%) of the cost of the labor. Every Class Member who replaced the Tires at a non-BMW Center (e.g., Discount Tires or other third party) will be eligible for reimbursement (in the form of a check) on the replacement tires covering one-hundred percent (100%) of the cost of the tires.

2. Reimbursement For Past Turanza Tire Replacements Between 10,001 And 15,000 Tire Miles (With Confirmed Irregular Wear Prior To 10,000 Miles)

Every Class Member who sought correction from a BMW Center for irregular wear prior to 10,000 Tire miles, but did not obtain replacement until between 10,001 miles and 15,000 miles from a BMW Center and was not reimbursed for one-hundred percent (100%) of the cost of the tires and one-hundred percent (100%) of the cost of the labor, is eligible for reimbursement (in the form of a check) as if he/she/it had sought to obtain replacement prior to 10,000 Tire miles. Every Class Member who sought correction from a BMW Center for irregular wear prior to 10,000 Tire miles, but did not obtain replacement until between 10,001 and 15,000 miles from a non-BMW Center (e.g., Discount Tires or other third party), is eligible for reimbursement (in the form of a check) for one-hundred percent (100%) of the cost of the tires.

3. Reimbursement For Past Turanza Tire Replacements Between 10,001 And 20,000 Tire Miles

Every Class Member who replaced the Tires at a BMW Center due to irregular wear between 10,001 and 20,000 Tire miles will be eligible for reimbursement (in the form of a check) on the replacement tires covering fifty percent (50%) of the cost of the tires and one-hundred percent (100%) of the cost of the labor. Every Class Member who replaced the Tires at a non-BMW Center (e.g., Discount Tires or other third-party) due to irregular wear between 10,001 and 20,000 Tire miles will be eligible for reimbursement (in the form of a check) on the replacement tires covering fifty percent (50%) of the cost of the tires.

4. Reimbursement For Past Turanza Tire Replacements Between 20,001 And 30,000 Tire Miles (With Confirmed Irregular Wear) Prior To 20,000 Miles

Every Class Member who can demonstrate, through documentation or declaration, that the irregular wear manifested prior to 20,000 Tire miles but that he/she/it did not seek correction from either a BMW Center or non-BMW Center (e.g., Discount Tires or other third party) until between 20,001 and 30,000 Tire miles, will be entitled to reimbursement of thirty-five percent (35%) of the cost of replacement tires and fifty percent (50%) of the cost of labor.

_____

of miles.   Each set of Tires, including new replacement Tires on a previously used class vehicle, falls under the terms of the settlement, provided it remains under the Tire mileage limitations.

5.      Future Reimbursement For Turanza Tire Replacements Up To 30,000 Tire Miles

Turanza Tires replaced at a BMW Center in the future due to irregular wear will be eligible for the pro-rata discount on replacement tires as follows: (a) before 10,000 Tire miles - one-hundred percent (100%) of cost of the tires and one-hundred percent (100%) of the cost of labor; (b) between 10,001 and 20,000 Tire miles - fifty percent (50%) of the cost of the tires and one-hundred percent (100%) of the cost of labor. In addition, if a Class Member can demonstrate that the irregular wear manifested prior to 20,000 Tire miles, but he/she/it did not seek correction from a BMW Center or Bridgestone-affiliated service center until between 20,001 and 30,000 Tire miles, the Class Member will be entitled to replacement Bridgestone tires at a thirty-five percent (35%) discount on the cost of the tires and a fifty percent (50%) discount on the cost of labor at a BMW Center or Bridgestone-affiliated service center.

(Br. 7–9.)

These settlement terms above offer affected BMW owners more relief than before. The SIB had capped eligibility for replacement reimbursement at 20,000 Tire miles; the settlement extends this by 50% to 30,000 Tire miles. Class members may now, under some circumstances, be reimbursed for 100% of costs and labor. And the settlement provides for reimbursement to those class members who chose third party tire shops for tire replacement. Additionally, the settlement sets up a procedure for resolution before a Special Master of owner/lessees' disputed claims about eligibility for reimbursement of Tire replacements after 20,000 Tire miles, with representation by plaintiffs' counsel at no cost.

### III.  Analysis

#### a.  Settlement and Release

In *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit set forth a non-exhaustive list of specific factors for district courts to consider in deciding whether to approve a class action settlement:  (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of

discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through the trial; (7) the ability of defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation ("the *Girsh* factors").

   *(1)  The complexity, expense and likely duration of the litigation*

   In Plaintiffs' Memorandum of Law submitted in connection with the final approval hearing [D.E. 122], counsel provides an accurate assessment of the litigation.

> The claims advanced on behalf of the Class involve numerous complex legal, engineering and economic issues, and would have required, *inter alia*, significant expert testimony at trial.  Moreover the case has been vigorously litigated (as to BMW NA) since May 2007 and, absent Settlement and assuming that some or all of Plaintiffs' claims survive the pending Motions to dismiss, the case would continue to be extensively litigated through class certification and, ultimately, trial.   Class counsel believe continued litigation would be complex, time consuming and expensive, with no certainty of a favorable outcome.  The present Settlement secures substantial benefits for the Class with none of the delay, risk and uncertainty of continued litigation.

(Br. 18.)

   Counsel points out that BMW has argued that its written warranty explicitly excludes tire coverage and BATO/Bridgestone contend that their written warranty do not cover the type of irregular Tire wear experienced by the class members.  The defendants have raised the driving habits of putative class members as a significant impediment to class certification.  To BMW owners who are driving on the Tires, or who paid to replace them, the "significance of immediate recovery by way of compromise" is meaningful when compared to "the mere possibility of relief in the future, after protracted and expensive litigation."  *Bullock v. Administrator of Kircher's Estate*, 84 F.R.D. 1, 10–11 (D.N.J. 1979).

   *(2) The reaction of the class to the settlement*

There were 14 objections and 27 opt-outs to this settlement out of the approximately 190,000 class members who received actual notice of the settlement terms.  Statistically, then, .000074% of those notified objected, and .00014% opted out.  Case law in this Circuit holds that a small number of objections is strong evidence that the settlement is fair and reasonable.  *E.g.*, *Bell Atl. Corp. v. Bogler*, 2 F.3d 1304 (3d Cir. 1993); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115 (3d Cir. 1990).  In *Varacallo v. Mass. Mutual Life Ins. Co.*, 226 F.R.D. 207, 251 (D.N.J. 2005), Judge Linares held where .06% of class members opted out of the settlement before him, and .003% raised objections, these results were "extremely low" and favored approval of the settlement.  Here the percentages are even more dramatic.  The Court easily finds that the second *Girsh* factor strongly favors approval.[2]

*(3) The stage of the proceedings and the amount of discovery completed*

According to plaintiffs' counsel, an "extensive investigation was conducted before and following commencement of the action, and significant discovery was produced and taken." (*See* Declaration of James C. Shah ("Shah Decl."), ¶ 18.)   Motions to dismiss were filed and fully-briefed and even argued in the California action.   The variety of circumstances

---

[2] In ¶ 28 of the complaint, plaintiffs reproduce examples of consumer dissatisfaction with the Tires' performance:

> "[T]he tires are horrible!  . . . [F]irst noticed the problem at 9,600 miles, contacted my dealer and was told . . . I probably needed 'new' tires."

> "I had the same problem that I keep reading about throughout many of the posts here.   Very loud noise and my tires wearing out around 15000 miles."

> "I can't stand the noise anymore!!  I buckled and tomorrow am getting a new set  of run flats after 25k miles on my 300i sport.  The guy at the store said he has seen many irate BMW owners since the new 3 series came out.  It's costing me about 1,260.00 out the door installed, . . . my sanity is worth more than the tires."

The very low number of objections strongly indicates that the settlement speaks effectively to the problems being encountered, including the lack of manufacturer/dealer response.

encompassed in the tiered relief strongly support the finding that sufficient focused discovery went forward in advance of the settlement.

   *(4) The risks of establishing liability and (5) The risks of establishing damages*

Plaintiffs represent that they "were aware of the difficulties and risks associated in proving liability." (Br. 15.)  In a recent decision, *Robinson v. American Honda Motors*, 551 F.3d 218, 223 (4th Cir. 2009), the court affirmed a Federal Rules of Civil Procedure Rule 12(b)(6) dismissal of express and implied warranty claims against Honda and Michelin relating to the wear and durability of Honda minivans' run-flat tires on the basis that Honda's warranty "clearly, unambiguously, and repeatedly" excluded tires from its coverage.  Rather than finding the tread wear at issue to be a covered "defect in workmanship and materials," the Fourth Circuit adopted the district court's reasoning that it was a "natural and expected consequence of tire ownership."  Without delving into the specifics of that case, the Court accepts it as reasonable indication of the uncertainty of this litigation depending upon the outcome of this litigation.

Additionally, plaintiffs' counsel acknowledges that they would have "met substantial challenges in proving damages." (Br. 16.)   This Court is satisfied that the risks associated with litigating liability and damages are replaced by tiered relief to the class members and a straight-forward means of establishing eligibility for reimbursement/replacement.

   *(6) The risks of maintaining a class action through the trial*

In supporting the applicability of this factor in their favor, plaintiffs' counsel cited to *Gable v. Land Rover North America, Inc.*, 2008 WL 4441960 (C.D.Cal. 2008), where the district court refused to certify a class of Land Rovers drivers who allegedly experienced irregular tire wear.  The Court agrees that the risks exist here, supporting a settlement outcome.

   *(7) The ability of defendants to withstand a greater judgment; (8) The range of*
   *reasonableness of the settlement fund in light of the best recovery; and (9) The range of*

> *reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation*

The seventh is the most relevant of these factors, and while defendants arguably could pay more, a decision to hold out for more in the face of the possibility of denial or delay does not benefit the interests of the class. Certain members, after all, are entitled to 100% refunds under the settlement. It is at this juncture that the Court will consider the filed objections, written as they are in a real world, rather than legal, context. Although no individual objecting to the settlement appeared at the hearing, each of the letters was articulate and thoughtful, and the Court and counsel discussed every one of them at the hearing.

All of the letters are filed on the docket, and they can be categorized into three groups, the first of which argues that the settlement could have been better. The letter sent by Mary Parsons [D.E. 116] indicates that she has approximately 26,000 miles on her Tires. She is in the same position as Sandra York [D.E. 114] (who does not indicate how many miles she has on her Tires) in that neither has replaced the Tires. Both objectors argue that all class members should receive 100% reimbursement. Likewise Kenneth H. Gittinger [D.E. 113], who replaced his Tires at approximately 14,000 miles, argues that he should receive 100% reimbursement for the costs of his replacement tires, instead of the 50% that he is entitled to. It appears that Nancy A. Steinhardt [D.E. 119], who has replaced her Tires more than one time, is asserting that she should receive 100% reimbursement for her first set of replacement tires because she complained to her dealer early on (and at argument plaintiffs' counsel indicates she may be correct).

These objections essentially criticize the way relief is tiered in the settlement. Fashioning relief this way, lines inevitably are drawn. At the end of the day, the appropriate test on the adequacy of the settlement terms is whether they are "fair and reasonable," *see Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1314 (3d Cir. 1993), and not whether every member of the class is

fully compensated.  On that basis, while recognizing the objectors' positions are not without a basis, the Court must conclude that full compensation is not a prerequisite for a fair settlement.

The second group of objectors asserts that the settlement does not compensate class members for the nuisance of driving on the Tires.  Within this group, David A. Dressler [D.E. 111], B. Jack Miller [D.E. 109], and Kristin Munro [D.E. 118] cite the "nuisance" or "loss of enjoyment" they experienced driving their vehicles.  These objectors are correct that settlement does not provide compensation for the subjective harm of loss of enjoyment.  But that does not render the settlement terms inadequate or unreasonable and as a practical matter, the vagaries and complexities of putting a dollar value on the nuisance and frustration, despite these objectors' vivid descriptions, illustrate how perilous continued litigation might have been.  Rather than a litigation focus on each owner/lessee's individual experience, the settlement offers a practical way of either getting new tires on the cars or reimbursing owners who have already done so.[3]

The third group objects to the 30,000 Tire mile cut-off for replacement reimbursement. *See* letters filed by Thomas A. Cerwin [D.E. 120], Jay L. Franz [D.E. 117], Daniel J. Franken [D.E. 112], Philip D. Delk [D.E. 110], and Paul Urbanick.  (Shah Decl., Exh. 3.)   At the fairness hearing, plaintiffs' counsel represented that the 30,000 Tire mile cut-off was a "hotly" contested issue that was ultimately resolved through mediation.  Extending the cut-off by 50% is significant.  There is no guarantee that owners who rode the Tires above 30,000 would have been included in the class had the case progressed.

---

[3] George Van der Sluys [D.E. 108] states that he deserves compensation in the form of reimbursement for tire and rim insurance because of other issues he experienced with the Tires, such as lost air pressure.  This case involves irregular tire wear causing excessive noise.  To the extent this objector seeks to bring any claim relating to tire pressure in the future, the settlement terms do not bind him, nor can they compensate him for claims that are not present in the complaint

A final letter falls outside the groups discussed above, that of Sallie H. Vance [D.E. 115], who wants her claim approved before she incurs costs replacing the Tires.  From the specificity and accessibility of information about eligibility provided to the class in the document titled, "Legal Notice Regarding BMW 2006 And 2007 3 Series Owners And Lessees" ("Class Notice") [D.E. 106, Exh. 4], the Court concludes that class members can ascertain eligibility status from a careful reading of the Class Notice materials.  (Br. 10–11.)

Based on the foregoing, the Court does not find that the objectors' concerns, while cogently expressed, bar its approval of the settlement.  Applying the *Girsh* factors, the Court finds the settlement to be fair, adequate and reasonable.  Distribution is likewise fair, reasonable, and adequate.  The thrust of the allocation plan is to reimburse class members for out-of-pocket expenses or future expenses related to Tire replacement depending upon common-sense factors.  The formula has appropriate flexibility and a reasonable, rational basis; it was fashioned by experienced class counsel; and it "provide[s] a straightforward and equitable nexus for allocation and will avoid a costly, speculative and bootless comparison of the merits of the Class Members' claims."  *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104 (S.D.N.Y.), *aff'd* 117 F. 3d 721, 135 (2d Cir. 1997).

### b.  Legal Fees, Reimbursement of Expenses, and Incentive Awards

The Court is advised that the prosecution of this case was undertaken on an entirely contingent basis.  The fee award sought is $1,200,000.00, which incorporates the reimbursement of $48,485.33 for costs.

Plaintiffs also seek the Court's approval of payment of incentive awards totaling $34,500, representing $5,000 each to Chad J. Cook and Kevin Morris, who were deposed in the California action, and $3,500 each to Deana Careccio, Arvind Chandran, Brenda Chaquette, Jeffrey Costa,

Lisa Costanza, William Hoyer, and Edward Mota, all of whom actively participated in the litigation.  (Br. 33.)

The factors in *Gunter v. Ridgewood Energy Corp.*, 223 F. 3d 190, 195 (3d Cir. 2000), govern the reasonableness of a request for attorneys' fees in a class action, and include:

> (1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the Class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards in similar cases.

The requested fee of $1.2 million turns out to be a negative multiplier of class counsel's lodestar.  (*Id.* at 26 (*citing* Shah Decl., ¶ 25.))  Additionally, fee award was negotiated during the mediation separately from, and after agreement to, the underlying settlement terms and the attorneys' fees do not affect in any way the available funds for class members who qualify for reimbursement.  (Shah Decl., ¶ 10.)  None of the objector letters mentioned the fee award.  Thus, after nearly 190,000 class members received notice of the fee sought, no objections were made. (Br. 26.)  *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005), where the Third Circuit held that a district court did not abuse its discretion in finding the absence of substantial objections by class members to the fee requests weighed in favor of approving the fee request. The Court does not see any need for extensive *Gunter* analysis given these strong indications that the fee sought is reasonable and fair.  As to that portion related to costs, counsel has presented a comprehensive list of expenses in Exhibits 4 and 5 to the Shah Declaration.   In *Safety Components Int'l Sec. Litig.*, 166 F. Supp. 2d 72, 108 (D.N.J. 2001), Judge Lechner held that "[c]ounsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." Finally as to the incentive awards, the Class Notice expressly disclosed that plaintiffs' counsel

-13-

intended to seek incentive awards for the named plaintiffs.  No objections were filed against the proposal.  Based on this fact, and in light of the named plaintiffs' efforts responding to discovery requests, and participating in mediation sessions, which undoubtedly aided plaintiffs' counsel in achieving a settlement for the class, the Court finds that the requested incentive awards are also fair and reasonable and are appropriately increased for those plaintiffs who were deposed.

## IV.   Conclusion

The Court grants final approval of the settlement; approves the proposed plan of allocation; and grants the request for legal fees, reimbursement of expenses, and provision of incentive awards.  Filed with this opinion is an appropriate Order.

/s/Katharine S. Haydend
Katharine S. Hayden, U.S.D.J.

April 29, 2010